*Formatted for Electronic Distribution*                                    *For Publication*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

In re:

    **Michael F. Montagne,**
        **Debtor.**

**Chapter 12 Case
# 08-10916**

Filed & Entered
On Docket
November 13, 2009

**Ag Venture Financial
Services, Inc.,**
        **Plaintiff,**
    **v.**
**Michael F. Montagne, John Montagne,
Diane Montagne, Montagne Heifers, Inc.,
Patenaude Grain, Ltd.,
Bourdeau Brothers, Inc.,**
        **Defendants.**

**Adversary Proceeding
# 08-1023**

*Appearances:* *Jess Schwidde, Esq. and John Harrington, Esq., Attorneys for Debtor*
        *Tavian Mayer, Esq., Attorney for Chapter 12 Trustee*
        *Jan Sensenich, Esq., Chapter 12 Trustee*
        *Gary Franklin, Esq. and Douglas J. Wolinsky, Esq. for Ag Venture Financial Services, Inc.*

## MEMORANDUM OF DECISION
### GRANTING DEBTOR'S MOTION TO DISMISS, DENYING DEBTOR'S REQUEST FOR DISGORGEMENT, AND OVERRULING CHAPTER 12 TRUSTEE'S OBJECTION TO CLAIM

On May 12 and 13, 2009, the Court held a bench trial (the "mini-trial") on the causes of action in

an amended complaint filed by Ag Venture Financial Services, Inc. ("Ag Venture"), related to a June 13,

2002 Commercial Promissory Note (the "Note") for $882,000 that it had entered into with Michael Mon-

tagne (the "Debtor") and his wife Diane Montagne. During the course of the trial, the Debtor and the

chapter 12 trustee learned that the original Note had been lost. The Debtor made an oral motion to dismiss

Ag Venture's cause of action on the Note on three grounds: (1) Ag Venture was required to show that it

was the holder of the original Note and to present it at trial, and did not do so; (2) Ag Venture's proof of

claim, related to loan # 321, was insufficient as it did not account for loss of the Note, and that failure

could not be remedied at such a late date; and (3) Ag Venture had run afoul of the Vermont Licensed

Lender Act ("LLA"), 8 V.S.A. § 2200 et seq., which made the loan unenforceable and required Ag Ven-

ture to disgorge all loan payments it had received on it (doc. # 282, pp. 20-25). The chapter 12 trustee

joined in the motion to dismiss (id. p. 25), and put forth arguments in support of his objection to Ag Ven-

ture's amended proof of claim. Ag Venture argued against dismissal (id. p. 26-28). The Court reserved

decision on the motion to dismiss and objection to claim and the parties filed post-trial briefs. For the rea-

sons set forth below, the Court finds that: (1) Ag Venture was the holder of the Note and could properly enforce it; (2) Ag Venture's proof of claim was sufficient; and (3) Ag Venture has violated the Vermont LLA, rendering its loan unenforceable, but the statute does not require Ag Venture to disgorge the sums it has already received under the Note.

**JURISDICTION**

The Court has jurisdiction over this adversary proceeding and the pending motion pursuant to 28 U.S.C. § 157(b)(2)(B), (C), and (K).

**DISCUSSION**

Because three separate grounds were asserted in support of the motion to dismiss, with three separate sets of facts examined under different statutes or rules, the Court will address each issue seriatim.

I.     **MAY AG VENTURE ENFORCE THE LOST NOTE
UNDER THE VERMONT UNIFORM COMMERCIAL CODE?**

The Debtor makes a number of related arguments that challenge whether Ag Venture can enforce the lost Note.

A.   RELEVANT PROCEDURAL HISTORY AND FACTS

Ag Venture's amended complaint alleged, inter alia, that on June 13, 2002, Michael Montagne and Diane Montagne executed and delivered a promissory note to Ag Venture in the amount of $882,000 (doc. # 30, ¶ 12). In his answer, Michael Montagne "admitted that the note indicated was signed on or about June 13, 2002" (doc. # 113, ¶ 12). This commercial promissory note was payable to the order of Ag Venture and was designated as loan # 321 (doc. # 30, Ex. J). Also on June 13, 2002, Ag Venture signed a non-recourse loan participation agreement (the "Agreement") with First Community Bank regarding loan # 321. (Trial Ex. F, at AGV 00467-00475). In the Agreement, Ag Venture was denominated the "Originating Bank" and First Community Bank was designated the "Participating Bank." Id.

1.   Mini-Trial Testimony

On the first day of the mini-trial, Ag Venture president Thomas Bellavance testified, over objection by both the Debtor and trustee, that the original signed Note did not appear in the loan file. In response to a query of where it would have gone, Mr. Bellavance answered: "Typically that note would have gone to our investor, First Community Bank" (doc. # 281, p. 247). He added that Ag Venture "repurchased a hundred percent of participation" of the Note in February 2008 from Lake Sunapee Bank, the successor by merger with First Community Bank; it was then "wholly-owned" by Ag Venture and no other investor had any interest in that loan. Id. at 247-48. According to Mr. Bellavance, when Ag Venture repurchased the loan, it requested from Lake Sunapee Bank that the original loan packet be returned to it. What Ag Venture received was the original Agreement and a letter from the Bank's vice-president that the repurchase had taken place. Id. p. 248.

When the mini-trial resumed the next day, Ag Venture's counsel, Gary Franklin, Esq., asked Mr. Bellavance what steps Ag Venture had taken to locate the original Note. Mr. Bellavance responded that they had looked through their loan file and records, and had contacted Lake Sunapee Bank by e-mail and telephone, all to no avail (doc. # 282, pp. 8-9). Mr. Bellavance stated that they had first looked for the Note when Ag Venture initiated legal proceedings in state court against the Montagnes in January 2008. Id. pp. 9-10, 12. He went on to say that "usually" when Ag Venture repurchased participation certificates, the notes would "come back to us." Id. p. 11. It was not until "the latter part of 2008" that Ag Venture first made contact with Lake Sunapee Bank "asking for the original promissory note and documents to come back," and they redoubled their efforts to locate the Note as the mini-trial neared. Id. On cross-examination, the Debtor's attorney, John Harrington, Esq., inquired whether Mr. Bellavance had informed Ag Venture's attorney that he hadn't been able to find the Note before counsel filed the Ag Venture proof of claim. Mr. Bellavance answered that he had not. Id. p. 13. Mr. Harrington read a section of the Agreement (Trial Ex. F) that provided that if First Community Bank elected to accelerate payment of the loan upon the borrower's default, Ag Venture would "immediately forward the original Loan Documents including any note" to the Participating Bank, id. p. 14. He pointed out that that provision was different from "the other agreements that [Mr. Bellavance] had testified about, where [he] had to give the original note to the bank." Id. Mr. Bellavance agreed that this Agreement was not one of the "typical" ones where Ag Venture forwarded the original note to the participating bank. Id. pp. 14-15.

Tavian Mayer, Esq., the attorney for the chapter 12 trustee, also inquired about Ag Venture's efforts to find the Note. Mr. Bellavance repeated that they first began looking for it prior to filing the state court litigation and that they had made substantial, but unsuccessful, efforts over a long period of time to find it. Id. p. 16. Mr. Bellavance stated that Ag Venture's counsel advised them to produce the Note "but I don't think we ever told them until recently we could not find it." Id. p. 17. He concluded on "May 6th [2009], just this last week," when Ag Venture had a "final conversation" with a Lake Sunapee executive, that they could not find the Note. Id. Mr. Mayer pointed out another section in the Agreement where it provided that Ag Venture "has additionally provided the Participating Bank with copies of the loan documents," id. p. 18, indicating that it would therefore appear that the original Note remained with Ag Venture.

2. Findings of Fact

Based upon this testimony, the credibility of the witnesses, and the associated documents in the record, the Court finds the following facts:

1. Michael Montagne signed the promissory note for loan # 321 on June 13, 2002. It was payable "to the order of Ag Venture Financial Services, Inc." Trial Ex. F at AGV 00476.

2.     On June 13, 2002, Ag Venture executed the Agreement with First Community Bank, which later
became Lake Sunapee Bank (together, the "Participating Bank") concerning that loan. In four dif-
ferent places, the Agreement indicated that Ag Venture would retain the original Note and/or for-
ward copies of the original Note to the Participating Bank under certain conditions:

   a.   ¶ 4(a)(2) provided that "The Originating Bank has additionally provided the Participating
        Bank with <u>copies</u> of the Loan documents that were executed . . . by the Borrower. . . "

   b.   ¶ 9(C)(1) provided that, <u>in the event of acceleration</u>, "The Originating Bank unconditional-
        ly agrees to immediately <u>forward the original</u> Loan Documents (including, without limita-
        tion, the original of the Borrower's note or notes evidencing the Loan. .. ) to the Participat-
        ing Bank";

   c.   ¶ 12(D)(1)provided that, <u>in the event the Originating Bank was in default</u>, "The Originat-
        ing Bank unconditionally agrees to immediately forward and assign the <u>original</u> Loan doc-
        uments (including, without limitation, the <u>original</u> of the Borrower's note or notes evidenc-
        ing the Loan and all security agreements and instruments thereof)";

   d.   ¶ 15(A) provided that, <u>in the event of the Originating Bank's insolvency</u>, "The Originating
        Bank unconditionally agrees to immediately forward and assign the <u>original</u> loan docu-
        ments (including, without limitation, the <u>original</u> of the Borrower's Note or Notes evidenc-
        ing the Loan and all security agreements and instruments therefor. . ."

Trial Ex. F, pp. AGV 00467-475 (emphases added).

3.     Ag Venture first realized that it could not locate the original Note in January 2008, and at that
point, began to search for it. Mr. Bellavance did not consider that the Note lost as of that date. In
the later part of 2008, Ag Venture asked the Participating Bank whether it possessed the original
Note. A bank executive indicated that they did not have it.

4.     Ag Venture repurchased 100% of the Note from the Participating Bank in February 2008, and as
of that date, no other bank had an interest in the Note.

5.     Despite Ag Venture's efforts to find the Note, its whereabouts cannot be determined.

6.     Ag Venture acknowledged the Note was lost in May 2009.

   B.   <u>Analysis</u>

      1.   Legal Arguments

The Debtor's first argument is that the failure to raise the issue that the Note was lost prior to trial
precludes Ag Venture from presenting evidence of inability to find the Note at trial (doc. # 280, p. 5). He
asserts that in order to enforce a note, Ag Venture must either show that it was the holder of the Note or
that it had the right to enforce the lost Note; Ag Venture presented no evidence of the former; and since
grounds for enforcing a lost note are part of the cause of action, which were not pled, the evidence con-

cerning Ag Venture's search for the Note should be excluded. Id. pp. 5-6. Moreover, the Debtor views the evidence of the lost Note as presenting a new theory that is prejudicial to his case. Id. pp. 6-7. The Debtor's second argument is that Ag Venture could not recover on the Note because: (1) Ag Venture had no right to enforce the Note; (2) the loss occurred when Ag Venture was neither in possession of the instrument nor entitled to enforce it; and (3) there was no evidence that the Note had not been transferred and could be enforced by another entity. Id. pp. 8-9.

The trustee makes a similar argument, but frames it differently. He asserts that the question of whether Ag Venture can enforce the Note is one of standing to prosecute the claim (doc. # 288 pp. 6-7). The trustee contends that Ag Venture had not proven its status as the holder of the Note when the complaint was filed and therefore did not have standing to enforce the obligation, citing In re Foreclosure Cases, 521 F. Supp. 2d 650, 653 (S.D. Ohio 2007), for the statement that, "[t]o show standing. . . the plaintiff must show that it is the holder of the note and mortgage at the time the complaint was filed" (doc. # 283 p. 6).

In its brief in opposition to the motion to dismiss, Ag Venture contends that "lack of standing is a defense that, in this case, has been waived," citing Fed. R. Civ. P. 9(a), which requires a party desiring to raise an issue of lack of capacity, authority, or legal existence to do so by a 'specific denial'" (doc. # 287 p. 1). Similarly, Ag Venture claims that the Debtor's challenge under the Uniform Commercial Code ("U.C.C.") that it has no right to enforce the Note is an affirmative defense that has been waived, as the Debtor never objected to Ag Venture's capacity or right to enforce the Note through the discovery process and those arguments should not now be considered by the Court. Id. pp. 3-4. Addressing the merits of the U.C.C. claim, Ag Venture asserts that it is entitled to enforce the Note as it is in possession of the Note payable to itself. Id. p. 7. Ag Venture goes on to explain that while it is unable to produce the original Note because it either lost it or delivered it to the Participating Bank, which failed to return it, Ag Venture "never lost possession of the Note because the Note was not assigned or transferred." It argues that the Note was not assigned because its terms provide that only if Ag Venture defaulted would it assign the original Note to the Participating Bank. Further, the Note was not transferred because it was not indorsed nor delivered to the Participating Bank with the intent that that bank receive the right to enforce it, since Ag Venture forwarded only a copy and thus the Note never left Ag Venture's possession. Id. pp. 7-8. In addition, Ag Venture claims that its "mere inability" to produce the original Note is not grounds to deny it the right of enforcement where the terms of the Note are undisputed, Mr. Montagne concedes that he signed the Note and borrowed the money, the Note is payable to Ag Venture, and the Note has never been indorsed or assigned. Id. pp. 8-9. Ag Venture concludes that it satisfied the requirements for standing to enforce the Note under 9A V.S.A. § 3-309(a) and (b) and, in order to ensure that Mr. Montagne is ade-

quately protected from a claim by another person seeking to enforce the Note, Ag Venture would consent

to the Court ordering Ag Venture to hold Mr. Montagne harmless from any such claims. Id. p. 10.

2.   Issue Presented

The issue presented is whether Ag Venture has standing to enforce the Note.

3.   Statutes at Issue and Pertinent Case Law

Bankruptcy law does not generally provide for the enforcement of promissory notes. As a result,

the legal obligations of the parties are determined by applicable non-bankruptcy law, which is usually

state law. See Butner v. United States, 440 U.S. 48, 54-55 (1979). There is no unified federal law govern-

ing promissory notes; however, each state has adopted a version of the U.C.C. concerning negotiable in-

struments, which applies to promissory notes. Accordingly, the Court turns to the Vermont statutes incor-

porating the Uniform Commercial Code, specifically Article 3 dealing with negotiable instruments – 9A

V.S.A.§ 3-101 et seq.

The Vermont U.C.C. statutes describe a "person entitled to enforce an instrument" as "(i) the

holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of a holder, or

(iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to sec-

tion 3-309 or 3-418(d)." 9A V.S.A. § 3-301. The general definitions section of Vermont's U.C.C. statute

defines a "holder," inter alia, as "(A) the person in possession of a negotiable instrument that is payable

either to bearer or to an identified person that is the person in possession." 9A V.S.A. § 1-201(21)(A). The

U.C.C. does not define "possession." Black's Law Dictionary (8th ed. 2004) defines the term as "The fact

of having or holding property in one's power; the exercise of dominion over property." Webster's Ninth

New Collegiate Dictionary (1985) defines possession as "the act of having or taking into control." In the

context of promissory notes, case law instructs that possession denotes actual physical control of the item.

See In re Wells, 407 B.R. 873, 879 (Bankr. N.D. Ohio 2009) ("Generally, a person is a holder of the note

by having physical possession of the note, which has either been endorsed to that person or endorsed in

blank."); In re Hill, 2009 WL 1956174 * 2, * 4 (Bankr. D.Ariz. July 6, 2009) (finding that bank that had

physical possession of a note and produced it at hearing was the holder).

The U.C.C. has a provision entitled "Enforcement of lost, destroyed, or stolen instrument," that

describes the conditions under which a lost or destroyed original note may be enforced:

(a) A person not in possession of an instrument is entitled to enforce the instrument if

(i) the person was in possession of the instrument and entitled to enforce it when loss
of possession occurred,

(ii) the loss of possession was not the result of a transfer by the person or a lawful sei-
zure, and

(iii) the person cannot reasonably obtain possession of the instrument because the in-
strument was destroyed, its whereabouts cannot be determined, or it is in the wrongful

possession of an unknown person or a person that cannot be found or is not amenable to service of process.

(b) A person seeking enforcement of an instrument under subsection (a) must prove the terms of the instrument and the person's right to enforce the instrument. If that proof is made, section 3-308 applies to the case as if the person seeking enforcement had produced the instrument. The court may not enter judgment in favor of the person seeking enforcement unless it finds that the person required to pay the instrument is adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument. Adequate protection may be provided by any reasonable means.

9A V.S.A. § 3-309.

Finally, the term "transfer" in § 3-309(a)(ii) also has a specific meaning:

(a) An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument.

(b) Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course, but the transferee cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument.

(c) Unless otherwise agreed, if an instrument is transferred for value and the transferee does not become a holder because of lack of indorsement by the transferor, the transferee has a specifically enforceable right to the unqualified indorsement of the transferor, but negotiation of the instrument does not occur until the indorsement is made.

(d) If a transferor purports to transfer less than the entire instrument, negotiation of the instrument does not occur. The transferee obtains no rights under this article and has only the rights of a partial assignee.

9A V.S.A. § 3-203. The term "negotiation," found in § 3-308(b), (c), and (d), is defined as "a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder." 9A V.S.A. § 3-201(a).

4. Discussion

The Debtor and the trustee both challenge Ag Venture's enforcement of the Note. The Debtor argues that Ag Venture did not satisfy its burden of proving enforcement pursuant to the requirements of § 3-309(a)(1), and thus failed to properly state a claim. The trustee, on the other hand, characterizes the issue as Ag Venture's lack of standing to prosecute any claims arising under loan # 321. See doc. # 289 p. 2 (Trustee Reply Brief) (stating that Ag Venture "has not established that it is asserting its rights, rather than those of a third party . . . [Ag Venture] thus lacks standing to make any claim for Loan # 321 and the action must be dismissed."). Ag Venture addresses the issue of standing, although it asserts that, as an affirmative defense, it had been waived.

The trustee has properly articulated the threshold issue – which incorporates the question of whether Ag Venture may enforce the Note – as one of standing. "In essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."

Warth v. Seldin, 422 U.S. 490, 498 (1975).The standing inquiry "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." As far as the constitutional limitations, Article III

> restricts federal courts to the resolution of cases and controversies. That restriction requires that the party invoking federal jurisdiction have standing-the personal interest that must exist at the commencement of the litigation. Standing is an essential and unchanging part of the case-or-controversy requirement of Article III. To qualify for standing, a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.

Davis v. Federal Election Com'n, __ U.S. __,  128 S.Ct. 2759, 2768 (2008) (internal quotation marks and citations omitted). Standing is a jurisdictional question and therefore "a defect in standing cannot be waived." In re Kang Jin Hwang, 396 B.R. 757, 768 (Bankr. C.D. Calif. 2008) (citation omitted). As a point of law, Ag Venture is mistaken when it asserts that standing may be waived.

Prudential standing is not a constitutional consideration but rather "embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.'" Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)). Prudential standing considerations include, inter alia, "'the general prohibition on a litigant's raising another person's legal rights. . ." Devlin v. Scardelletti, 536 U.S. 1, 7 (2002) (quoting Allen, 468 U.S. at 751). In other words, "the injured party must assert its own claims, rather than another's," to have prudential standing. In re Wilhelm, 407 B.R. 392, 398 (Bankr. D.Idaho 2009). Accord Savage & Assocs., P.C. v. Mandi (In re Teligent, Inc.), __ B.R. __, 2009 WL 3037999 at * 9 (Bankr. S.D.N.Y. Sept. 24, 2009). "Generally, a party without legal rights to enforce an obligation under applicable substantive law lacks prudential standing." Doran v. 7-Eleven Inc., 524 F.3d 1034, 1044 (9th Cir. 2008). Similar to Article III standing, prudential standing is a "threshold determinant of the propriety of judicial intervention," Warth, 422 U.S. at 498-99, and places a limit "on the exercise of federal jurisdiction." Allen, 468 U.S. at 751.

In this case, the constitutional threshold of standing has been satisfied. Ag Venture asserts it has been injured by the Debtor's conduct – default on the note – which suffices for a concrete, particularized, and actual injury, traceable to the Debtor's conduct, and likely to be redressed by a favorable ruling allowing it to enforce the Note. A number of bankruptcy courts, especially in the context of motions for relief from stay, have scrutinized whether a party is asserting its own rights, and thus satisfies the prudential standing requirement and may enforce the note in issue. See, e.g., Wilhelm, 407 B.R. at 398, Kang Jin Hwang, 396 B.R. at 764. In so doing, they have analyzed the movant's legal rights under applicable substantive law – Article 3 of the U.C.C. concerning whether a party is a holder of the note and may enforce it. That is the same question presented here, particularly since the Debtor has questioned whether an entity other than Ag Venture may be the proper party to enforce the Note, and the Court therefore finds the analysis in those cases extremely helpful.

It is uncontested that the original Note at issue in this action is lost. Accordingly, the requirements of 9A V.S.A. § 3-309 must be met in order for Ag Venture to be able to enforce the Note. The first question the Court must answer is when was the Note lost. The testimony on this point was imprecise. Mr. Bellavance acknowledged that he could not find the Note prior to the date Ag Venture commenced the state court litigation (on January 29, 2008). Ag Venture's staff intermittently looked for the Note, without success; Mr. Bellavance concluded that it was lost in May 2009, immediately in advance of the trial. While determining when something is actually "lost" can be a process that begins with not being able to find it, then continues through a period of looking for it, and eventually concludes with a concession that it is lost, the Court does not concur with Mr. Bellavance's declaration that the Note was lost in May 2009 and instead finds that the Note was lost prior to the January 29, 2008 filing of the state court complaint. This finding requires Ag Venture to show that it was the "holder of the note and the mortgage at the time the complaint was filed." In re Foreclosure Cases, 521 F. Supp. 2d at 653.

    a.  U.C.C. § 3-309(a)(i)

Preliminarily, the parties do not contest that the note at issue is a negotiable instrument. Neither do they contest the terms of the Note or the existence of the underlying debt (doc. # 277, ¶¶ 8, 15-19, 21-25).

Section 3-309(a)(i) entitles a person not in possession of an instrument to enforce it if the person (here, Ag Venture) was in possession of the instrument and entitled to enforce it when loss of possession occurred. The Court concludes that this prong of § 3-309(a) has been met. Mr. Bellavance testified that "typically" when other banks purchased notes, Ag Venture would give physical possession of the note to the purchaser, although he later added the caveat that this was not one of their typical notes. Importantly, he did not testify that Ag Venture gave the Note at issue to the Participating Bank, even though he stated that he asked that bank if they had the Note (implying that he thought it possible Ag Venture had delivered the original Note to it). However, what this Court finds dispositive on the question of possession and whether the Note was delivered to the Participating Bank are the terms of the Participation Agreement itself. Four different sections of the Agreement, set forth in the Facts, supra, indicated that Ag Venture retained possession of the original Note. These four statements serve as persuasive evidence that the original Note, which had been signed by Michael and Diane Montagne on June 13, 2002 – the same day that Ag Venture executed the Agreement – was not delivered to the Participating Bank as a part of the Agreement transaction, that Ag Venture retained possession of it, and that Ag Venture possessed it when it was lost. Moreover, no other documents were introduced from that loan file that showed that the loan was sold or assigned to another entity. See Trial Ex. 2.- Loan File. The Court thus finds that Ag Venture was in possession of the instrument when loss of possession occurred. Ag Venture was also entitled to enforce the Note when possession was lost because it was payable to the order of Ag Venture and showed no indorsements.

b.   U.C.C. § 3-309(a)(ii)

The second prong of § 309(a) allows a person not in possession of an instrument to enforce it if "the loss of possession was not the result of a transfer by the person." An instrument is transferred, pursuant to the Vermont U.C.C., "when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." 9A V.S.A. § 3-203(a). As indicated above, Ag Venture neither delivered the original Note to the Participating Bank, nor did it indorse the Note, either in blank or specifically to the Participating Bank. Furthermore, the Agreement states that Ag Venture was selling only the ownership[1] of the loan to the Participating Bank. The first paragraph of the Agreement provides:

> Sale of Loan Participation Interest: The Originating Bank hereby sells, assigns, transfers and delivers to the Participating Bank, 100 percent or $882,000.00 interest in the Originating Bank's ownership rights in and to the indebtedness, promissory note or notes, collateral security and all documents relating to the loan or loans described above…

Trial Ex. F, p. AGV 00467. By its terms, Ag Venture did not transfer the Note to the Participating Bank, as that term is defined by the Vermont U.C.C. Neither was the Note negotiated, pursuant to § 3-201(a), because possession was not transferred by a person other than the issuer. Although the first paragraph of the Agreement used the words "transfers and delivers," the plain text makes clear that what Ag Venture was transferring and delivering was 100% of its ownership rights in the Note (as those words are used in their regular, rather than U.C.C. sense); nowhere else in the Agreement was there any reference to physical delivery of the original Note. Accordingly, the Court finds that the Note was not transferred by Ag Venture to the Participating Bank and therefore the loss of possession was not the result of transfer pursuant to § 3-309(a)(ii).

c.   U.C.C. § 3-309(a)(iii)

The final prong of § 3-309(a) allows a person not in possession of an instrument to enforce it if the instrument's whereabouts "cannot be determined." Mr. Bellavance testified that Ag Venture staff intermittently looked for the Note over the course of a year and a half (January 2008 to May 2009): they looked through their loan file and records, and contacted the Participating Bank, all to no avail. Based on Mr. Bellavance's testimony, the Court concludes that the original Note's whereabouts cannot be determined, and therefore this final prong of § 3-309(a) has been met.

d.   U.C.C. §§ 3-309(b) and 3-308

In order to enforce a lost note, a party must not only satisfy the three prongs of § 3-309(a), but also the requirements of § 3-309(b) – it must prove the terms of the instrument and the person's right to enforce the instrument. Ag Venture has proven the right to enforce the instrument under § 3-309(a). As far

---

[1] The U.C.C. describes a significant difference between being a holder and an owner. The Official Comment to 9A V.S.A. § 3-309 explains that the Revised Article 3 modified "former Section 3-804. The rights stated are those of 'a person entitled to enforce the instrument' at the time of loss rather than those of an 'owner' as in former Section 3-804."

as proving the terms of the instrument, Ag Venture attached a copy of the Note to its amended proof of claim (doc. # 08-10916, claim # 12-2). A copy of the original Note was admitted at the mini-trial (Trial Ex. 4). The duplicate suffices to prove the terms of the instrument, and there has been no evidence that the loss of the original is attributable to bad faith. See Fed. R. Bankr. P. 3001(c) ("When a claim. . . is based on a writing, the original or a duplicate shall be filed with the proof of claim.") (emphasis added); Fed. R. Evid. 1004(1) ("The original is not required, and other evidence of the contents of a writing . . . is admissible if – (1) All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith."). Moreover, Stipulated Facts 15-19, found in the amended joint pre-trial statement (doc. # 277), indicate that the Debtor did not contest the terms of the instrument. Accordingly, since Ag Venture has proven the terms of the lost Note and has proven its right to enforce it under § 3-309(b), Ag Venture may enforce the Note. Once that proof is made, § 3-309(b) requires a person seeking to enforce a lost note to comply with § 3-308.

Section 3-308(a) concerns the authenticity of signatures on a note, and states that signatures on instruments are admitted "unless specifically denied in the pleadings." Since Michael Montagne admitted that he signed the Note for loan # 321 (doc. # 113, ¶ 12), § 3-308(a) has been satisfied. Section 3-308(b) states that if the plaintiff has proven entitlement to enforce the instrument under § 3-301, it can be paid unless the debtor "proves a defense or claim in recoupment." § 3-308(b).The Debtor did assert a setoff/recoupment affirmative defense in his amended answer and counterclaim (doc. # 111). Those affirmative defenses remain to be adjudicated but do not at this point serve as a bar to the Court making a determination on whether Ag Venture may enforce a lost Note pursuant to § 3-309.

Having satisfied § 3-308(a) and with § 3-308(b) not relevant to the question of enforcement, the Court returns to the last two sentences of § 3-309(b), which state that a court may not enter judgment in favor of the person seeking enforcement (Ag Venture) unless it finds that the person required to pay the instrument (the Debtor) is "adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument. Adequate protection may be provided by any reasonable means." The Court has found that Ag Venture can enforce the Note, and that it bought back 100% ownership of the Note from the Participating Bank in February 2008. No one else would be legally permitted to enforce the Note and therefore the Court finds that no adequate protection is necessary. Accordingly, Ag Venture has satisfied both § 3-309(a) and (b), and possesses both constitutional and prudential standing to enforce the lost Note.

In a somewhat related vein, the Debtor argues that Ag Venture's failure to raise the issue of loss or destruction of the Note prior to trial precludes it from presenting evidence of its inability to find the Note. The Debtor focuses on the U.C.C. provisions concerning who can enforce a note (§ 3-301), but states – without case law support – that the grounds for enforcing an instrument not in Plaintiff's possession are

elements of the Plaintiff's cause of action that must be pleaded (doc.# 280, p. 6). The Debtor then contends that because the joint pre-trial statement contained a demand that the original Note be produced at trial to prove Ag Venture's status as a holder and Ag Venture did not produce it, the evidence of loss should be excluded as outside the scope of issues presented for trial. The Debtor adds that allowing Ag Venture to "change its theory" after trial commenced would be "substantially prejudicial" to the Debtor. Id. pp. 7-8.

The Court rejects this line of argument proffered by the Debtor. As discussed above, the question of who may properly enforce a note is a question of prudential standing; it is not an element of the cause of action on the Note (which relates to contractual issues) that must be pleaded. See, e.g., Kwon v. Yun, 606 F. Supp. 2d 344, 368 (S.D.N.Y. 2009) ("To establish a prima facie case for recovery under a promissory note, [movant] must show proof of a note and failure to make a payment.") (quotation marks and citations omitted). Cases have held that the question of prudential standing may be raised at any stage of the proceedings, and even if the parties themselves have not raised the issue. See Main Street Organization of Realtors v. Calumet City, Ill., 505 F.3d 742, 747-48 (7th Cir. 2007); Thompson v. County of Franklin, 15 F.3d 245, 248 (2d Cir. 1994) (examining subject matter jurisdiction, including prudential standing, sua sponte, even when court below had not passed on it and if parties failed to raise it, because it implicates the court's subject matter jurisdiction). Therefore, allowing testimony concerning the lost Note was proper, as the issue implicated whether Ag Venture satisfied the prudential standing limitations on federal court jurisdiction. The Court thus rejects Debtor's arguments that allowing such evidence permitted Ag Venture to change its theory of the case, or prejudiced the Debtor.

For these reasons, the Court holds that Ag Venture has established that it may enforce the Note evidencing loan # 321 and denies the Debtor's motion to dismiss based on the first ground asserted.

## II.    WAS AG VENTURE'S PROOF OF CLAIM FATALLY DEFECTIVE?

### A.    RELEVANT PROCEDURAL HISTORY & FACTS

1.    On November 7, 2008, Ag Venture filed a proof of claim, dated November 6, 2008 and signed by its president, Thomas Bellavance (main case # 08-10916, claim # 12-1). The claim was for the sum of $2,535,768.74. Schedule A attached to the proof of claim, entitled "Calculation of Amounts Due," summarized the different notes, security agreements and mortgages upon which the sum set out in the proof of claim had been calculated, and stated that all of those documents were attached to schedule A as exhibits. Paragraph 3 of schedule A referred to the attached note, security agreement, and mortgage which supported the $882,000 note executed on June 13, 2002 at issue here. However, those documents (as well as the others supporting the November 2008 proof of claim) were not attached.

2. On March 6, 2009, Ag Venture filed an amended proof of claim (# 12-2). The body of the document (the proof of claim form and schedule A) were exactly the same as the November 7, 2008 proof of claim; the only difference was that the amended proof of claim attached copies of all of the notes, security agreements, and mortgages referred to in schedule A, including the June 2002 note and security agreement related to loan # 321. The claims register description of claim 12-2 indicated "Refiling proof of claim with exhibits that were previously omitted." (claims register, #08-10916, claim #12-2).

3. The chapter 12 trustee filed an objection to claim #12 on May 1, 2009 (doc. # 133 in # 08-10916).

4. Also on May 1, 2009, the chapter 12 trustee moved to amend the Court's Scheduling Order to allow the trustee's objection to Ag Venture's claim to be heard in the mini-trial (doc. # 262). The trustee asserted that allowing this issue was within the scope of the legal and factual issues to be tried, and that disallowance of Ag Venture's claim would enable the general unsecured creditors some recovery in the case. Id. Both the Debtor and Ag Venture consented to the inclusion of the trustee's objection to claim in the mini-trial.

5. The Court issued an Amended Scheduling Order, providing that the trustee could participate in the mini-trial only to the extent of the claims and issues identified by the parties in the pre-trial statement, including examining witnesses and submitting post-trial brief (doc. # 270). The Order also provided that to the extent the mini-trial resulted in findings of fact or conclusions of law dispositive of issues raised by the trustee's objection to claim, the trustee would be bound by those conclusions. Id.

6. The evidence at trial established that Ag Venture knew, at least from January 2008, that it could not find the original Note for loan # 321.

7. Ag Venture has not filed an affidavit of lost note.

B. Legal Arguments

In his brief, the chapter 12 trustee contends that the Ag Venture proof of claim is fatally defective (doc. # 283, p. 4). He points out that ¶ 7 of the Bankruptcy Official Proof of Claim Form (Form 10) requires a claimant to advise that, if the documents upon which the proof of claim relies are not available, "please explain," and that Fed. R. Bankr. P. 3001(c) requires that "if the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim" (doc. # 283 pp. 4-5). The trustee argues that while the simple failure to attach supporting documents to the proof of claim may not be fatal, the circumstances here are "much more egregious" since Ag Venture never sought to amend its proof of claim or complaint to address the issue of the lost Note. He adds that without "an original note to support its claim, and no issue having been preserved relative to its loss or absence,

the claim must fail." Id. p. 5. The Court has already rejected this latter argument above, finding that testi-

mony related to the Note's loss implicated prudential standing issues and were properly raised.

C. ANALYSIS

The Court finds the trustee's argument concerning the consequences of failure to follow Rule

3001(a) and (c) to be without merit. The full text of Rule 3001(a) and (c) is as follows:

> (a) A proof of claim is a written statement setting forth a creditor's claim. A proof of
> claim shall conform substantially to the appropriate Official Form.
> * * *
>
> (c)     When a claim . . . is based on a writing, the original or a duplicate shall be filed
> with the proof of claim. If the writing has been lost or destroyed, a statement of the
> circumstances of the loss or destruction shall be filed with the claim.

Fed. R. Bankr. P. 3001 (a) and (c) (emphases added). Official Form 10, the Proof of Claim form, gives

these instructions for attached documents:

> Attach to this proof of claim form redacted copies documenting the existence of the debt
> and of any lien securing the debt. You may also attach a summary. You must also attach
> copies of documents that evidence perfection of any security interest. You may also attach
> a summary. FRBP 3001(c) and (d). . . Do not send original documents, as attachments may
> be destroyed after scanning.

Official Form 10, p. 2, Instruction Section, ¶ 7 (emphases added). The plain language of the official form

requires a copy, not the original, of the writing to be attached to the proof of claim. Similarly, Fed. R.

Bankr. P. 3001(c) allows either a duplicate or the original, to be filed with the proof of claim. Ag Venture

attached a duplicate photocopy of the Note to its amended proof of claim, thus satisfying the first sentence

of Rule 3001(c).

Whether a court should deny a (late) amendment to a timely-filed proof of claim "rests with the

sound discretion of a bankruptcy judge." In re Enron Corp., 298 B.R. 513, 520 (Bankr. S.D.N.Y. 2003)

(citation omitted). "Although amendments to proofs of claim should in the absence of contrary equitable

considerations or prejudice to the opposing party be freely permitted, such amendments are not automatic.

. ." Id. (quoting In re W.T. Grant Co., 53 B.R. 417, 420 (Bankr. S.D.N.Y. 1985)). Amendments are al-

lowed, however, "where the purpose is to cure a defect in the claim as originally filed, to describe the

[original] claim with greater particularity or to plead a new theory of recovery on the facts set forth in the

original claim." Id. Many courts have applied the liberal standards of Fed. R. Civ. P. 15 (as applied to

contested matters through Fed. R. Bankr. P. 7015 and 9014) to amendments of proofs of claim. Id. at 521.

Case law has fleshed out in what circumstances amendment is allowed. See In re Telephone Co. of Cent.

Fla., 308 B.R. 579 (Bankr. M.D.Fla. 2004) (allowing post-bar date amendment where original claim gave

adequate notice of the existence and nature of the claim, even where amendment increased amount of

claim); Gens v. Resolution Trust Corp., 112 F.3d 569 (1st Cir. 1997) (allowing amendment to proof of

claim where amendment substituted real party in interest for claimant originally listed, and finding no pre-

judice where claim remained the same); In re Houbigant, Inc., 188 B.R. 347 (Bankr. S.D.N.Y. 1995) (permitting amendments when purpose is to correct defects or more fully explain claim, but not to create new claim).

Here, the original claim was timely filed on November 7, 2008, the claims bar date was February 2, 2009, and the amended proof of claim was filed on March 3, 2009. As the trustee points out, the proof of claim was the same in both instances – the only difference was that the documents supporting the proof of claim were attached to the amended proof of claim, i.e., Ag Venture was curing a defect in the original proof of claim. Given that there were ten months of litigation in state court before the litigation was removed here, and the proof of claim was timely filed, the Debtor and trustee clearly had adequate notice of the existence and nature of Ag Venture's claim. The Court finds that the allowing this late filed amendment to Ag Venture's proof of claim causes no prejudice to either the Debtor or the chapter 12 estate.

The next question concerns how the Court should assess the requirements of the second sentence of Rule 3001(c) as applied to this case: whether Ag Venture was required to file a statement of the circumstances of loss with the original claim, or the amended claim, and the legal consequences of not filing that statement on the status of the claim. Courts have viewed the two sentences of Rule 3001(c) as presenting an either-or requirement concerning proofs of claim: if the proponent complies with one of the requirements, it is not necessary to comply with the other. See In re Farmland Industries, Inc., 305 B.R. 497, 502  (Bankr. W.D. Mo. 2004) (ruling that where creditor did not attach a writing to a proof of claim but attached a series of letters and affidavits to verify the terms and conditions of a lost agreement, the failure to attach the written agreement to the proof of claim was not fatal); eCast Settlement Corp. v. Tran (In re Tran), 369 B.R. 312, 316 (S.D.Tex. 2007) ("Rule 3001(c) requires a creditor to satisfy at least one of two requirements in filing a proof of claim based on a writing. See Rule 3001(c). The creditor 'shall' either: (i) file the writing upon which the claim is based; or (ii) provide a statement of the circumstances under which the writing cannot be filed.") (emphasis added); Id. at 316-17 ("A creditor that does not file the writing upon which a claim is based may provide an explanation of the circumstances under which the writing cannot be filed."); In re Parrish, 326 B.R. 708, 718-19 (Bankr. N.D.Ohio 2005) ("A proof of claim based on a loan secured by a mortgage on the debtor's home does not substantially comply with the rules unless it includes a copy of the promissory note or a satisfactory explanation for why the note is not provided."); In re Gurley, 311 B.R. 910, 916 (Bankr. M.D.Fla. 2001) (same, citing cases).

The terms of Rule 3001(c) explicitly allow a duplicate writing to be filed. In this case, Ag Venture filed a duplicate of the Note and security agreement; neither the trustee nor the Debtor objected to the duplicate having been filed.  Although it certainly would have been clearer if Ag Venture had filed a statement of lost original with the copy of the Note, the filing of the amended proof of claim, with attached exhibits, fulfilled the requirements of Rule 3001(c). Consequently, Ag Venture does not forfeit any

rights due to its failure to file an affidavit of loss with the duplicate of the Note and security agreement in support of the amended proof of claim.

Even if the Court were to assume that Ag Venture's proof of claim failed to conform to Rule 3001(c), that failure alone would not warrant disallowance of its claim, as urged by the trustee. Failure to comply with rule 3001(c) does not result in disallowance of a claim: it is merely intended to provide procedural guidance with respect to the statutory grounds for submitting claims. The majority of bankruptcy courts take the view that 11 U.S.C. § 502 is the exclusive grounds for disallowance of a claim, and "[n]on-compliance with Rule 3001(c) is not one of the statutory grounds for disallowance." Heath v. American Express Travel Related Servs. Co., Inc. (In re Heath), 331 B.R. 424, 435 (9th Cir. BAP 2005). See B-Line, LLC v. Kirkland (In re Kirkland), 379 B.R. 341, 350-53 (10th Cir. BAP, 2007) (discussing the strong policy reasons for adhering to the majority view); In re Burkett, 329 B.R. 820, 828 (Bankr. S.D.Ohio 2005) (listing cases so holding).

Moreover, the statute explaining the interaction between the Bankruptcy Code and Rules provides that the Rules "shall not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2075. This statute supports the view that courts cannot add non-compliance with Rule 3001(c) as a basis for disallowing a claim under Bankruptcy Code § 502; to do so would improperly enlarge a substantive right provided by the Code. See Dove-Nation v. eCast Settlement Corp. (In re Dove-Nation), 318 B.R. 147, 150-51 (8th Cir. BAP 2004) ("Section 502(b) sets forth the sole grounds for objecting to a claim and directs the court to allow the claim unless one of the exceptions applies" and "[t]he rules are designed to supplement the statute, not replace it.") (citing 28 U.S.C. § 2075) (emphasis added); In re Porter, 374 B.R. 471 (Bankr. D.Conn. 2007) (pagination unavailable) (same).

At most, failure to include required supporting documentation negates a claim's prima facie validity, In re Parrish, 326 B.R. at 719, thus shifting "the burden of proving the existence and amount of the claim [ ] to the claimant." Id. (citation omitted). See In re Stoecker, 5 F.3d 1022, 1028 (7th Cir. 1993) ("If the documentation [in compliance with Rule 3001] is missing, the creditor cannot rest on the proof of claim. It does not follow that he is forever barred from establishing the claim. Nothing in the principles or practicalities of bankruptcy or in the language of any rule or statute justifies so disproportionate a sanction for a harmless error. Forfeitures of valuable claims, and other heavy sanctions, should be reserved for consequential or easily concealed wrongs."); In re Jorczak, 314 B.R. 474, 481 (Bankr. D.Conn. 2004) (holding that if a claimant "fails to allege facts in the proof of claim that are sufficient to support the claim, e.g., by failing to attach sufficient documentation to comply with Fed. R. Bankr. P. 3001(c), the claim is not automatically disallowed; rather, it is merely deprived of any prima facie validity which it could otherwise have obtained.").

Here, the requirements of Rule 3001(c) were met, as Ag Venture submitted a duplicate of the Note and security agreement with the amended proof of claim. The Court therefore rejects the trustee's argument that Ag Venture's amended proof of claim was fatally deficient and overrules the trustee's objection to Ag Venture's amended proof of claim.

### III.  IS LOAN # 321 UNENFORCEABLE PURSUANT TO THE VERMONT LICENSED LENDER ACT, 8 V.S.A. § 2233?

#### A.  FACTUAL BACKGROUND

##### 1. Stipulated Facts

1. Ag Venture is a Vermont corporation. As a farm finance company, it lends money, originates loans on behalf of other lenders and services loans to farmers, especially dairy farms in the northern and western part of Vermont (doc. # 277, Stip. Facts 1, 2).

2. At all times from June 13, 2002 to the present, Ag Venture was licensed as a lender pursuant to Title 8, Chapter 73, of the Vermont Statutes Annotated (doc. # 277, Stip Fact 3).

3. On June 13, 2002, the parties entered into a loan agreement for loan # 321, in the original stated principal amount of $882,000.00 (doc. # 277, Stip Fact 8).

4. Ag Venture charged interest on the full stated principal amount of loan # 321 beginning on June 13, 2002 (doc. # 277, Stip Fact 9).

5. Ag Venture continued to charge interest on the outstanding principal amount of loan # 321, as reduced from time to time by payments received to the extent applied by Ag Venture to principal, through the date of the filing of Michael Montagne's bankruptcy petition (doc. # 277, Stip Fact 10).

6. Payments to Ag Venture from purchasers of milk from the Montagnes constituted part of the purchase price owed by such entity or entities to the Montagnes for milk sold by them. Ag Venture received such payments on the basis of one or more so-called "milk check assignments" (doc. # 277, Stip Facts 11, 12).

7. Pursuant to the terms of such assignments, the milk purchaser was directed by the Montagnes, subject to certain deductions for amounts owed to the milk purchaser itself, to remit certain amounts periodically to Ag Venture (doc. # 277, Stip Fact 13).

8. Pursuant to the terms of such assignments, the milk purchaser was directed by the Montagnes to continue making such payments to Ag Venture until notice of cancellation of the assignment, signed in writing by Ag Venture, was received by the milk purchaser (doc. # 277, Stip Fact 14).

9. Pursuant to the notice of loan agreement [for the Note dated June 13, 2002], the loan proceeds were to be used to refinance debt (doc. # 277, Stip Fact 25).

10. The total amount of $305,034.10 was credited to pay off or reduce debt, including late fees, purportedly owed by Michael and Diane Montagne to Ag Venture (doc. # 277, Stip Fact 32).

11. The sum of $477,865.77 from the loan # 321 proceeds were credited to the loan # 171 suspense account (doc. # 277, Stip Fact 35).

12. No part of this $477,865.77 was ever credited to any segregated or trust account held by any other institution for the benefit of the Montagnes (doc. # 277, Stip Fact 36).

13. No part of this $477,865.77 was credited to amounts due on loan # 171, nor did any credit to the loan # 171 suspense account reduce the amount charged or received by Ag Venture on Loan # 171, except to the extent that the suspense account was debited subsequent to June 13, 2002, to make certain payments purportedly due on loan # 171 (doc. # 277, Stip Fact 37).

14. This $477,865.77 was debited, subsequent to June 13, 2002, in amounts and on dates which matched the amounts and dates of certain payments and credits to or for the benefit, actual or purported, of Michael and/or Diane Montagne (doc. # 277, Stip Fact 38).

15. Ag Venture did not pay or credit to the benefit of Diane and/or Michael Montagne any amount constituting interest on, or intended to offset interest charged on, all or any part of the $477,865.77, for all or any part of the period between the date of closing on loan # 321 and the date of the respective debits to the loan # 171[2] suspense account balance (doc. # 277, Stip Fact 40).

16. The total amount paid by or on behalf of Michael and Diane Montagne on loan # 321, or credited to loan # 321 from the loan # 171 suspense account, as described above, is $445,967.50, of which $309,253.94 was allocated to interest and $136,713.66 to principal, as of March 21, 2009 (doc. # 277, Stip Fact 42).

   2. Testimony

Thomas Bellavance, president of Ag Venture, testified about loan # 321. He stated that one of the terms of the Agreement with the Participating Bank was that the loan had to be "fully disbursed" on the (June 13, 2002) closing date (doc. # 281, p. 33). While $305,034.10 of the $882,000 was used to pay off four loans and a pre-closing account that the Montagnes had with Ag Venture, id. p. 27, the remainder – $477,862.77 – was "disbursed off of loan 321 and was put into loan 171 suspense account for the benefit of Mr. and Mrs. Montagne." Id. p. 30. As to the funds in the suspense account, "Mr. Montagne came in and drew those funds out for his purposes." Id. p. 36. Mr. Bellavance viewed the $477,865.77 as "Mr. Montagne's money in his designated account," id. p. 101, although when pressed, he admitted that Mr. Montagne had no ownership interest in, and no security interest in, that checking account or that invest-

---

[2] The commercial promissory note for loan # 171 shows that it was dated November 8, 2000, signed by Michael and Diane Montagne, and was in the amount of $425,000, payable to the order of Ag Venture (doc. # 30, Ex. C).

ment account into which that money had been deposited. <u>Id.</u> p. 102. All Mr. Montagne had was an obliga-tion on Ag Venture's internal records to pay him the $477,865.77 when he asked for it. <u>Id.</u> at p. 103.

Mr. Bellavance reiterated that when he stated the $477,865.77 was "disbursed" on the closing date, he meant that the sum was "credited" to "the loan 171 suspense account." <u>Id.</u> p. 47. He explained the suspense account as follows:

> Finance companies, everything is done by loan accounting, but what we did is we set an obligation up. It wasn't as simple as just transferring the money, you know, doing a loan accounting entry, putting it in at that Ag Venture suspense account. What we did at that point in time, we created a liability. Ag Venture was now liable to Mr. Montagne for that 477 thousand dollars, that went into the suspense account.

<u>Id.</u> p. 56. This was, however, an internal Ag Venture accounting item, which "could be totally monitored and followed," even though there was no documentation of any such transaction with Mr. Montagne. <u>Id.</u> Mr. Bellavance explained that the $477,865.77 balance, while initially "applied towards the suspense ac-count for Mr. Montagne" later "found its way into [AV's] general ledger" (general checking account) which was swept every day into some kind of investment account. <u>Id.</u> p. 95.

Mr. Bellavance went on to say that Ag Venture started charging the Montagnes interest on the en-tire $882,000 on day one, <u>id.</u> p. 36-37, which included interest on the $477,865.77 that had been placed in the suspense account. <u>Id.</u> p. 46, 99. After the funds were swept from the checking account and had "found their way" into Ag Venture's investment account, Ag Venture earned interest on those funds, depending on "how much money was swept, when it was swept, sometimes what would happen is we would get an earnings credit toward the cost of maintaining the cash management program at the Chittenden Bank." <u>Id.</u> p. 122-23. Once Ag Venture "had earned enough earnings credit to pay the maintenance of the cash man-agement, then we would get an actual debit of interest into our account." <u>Id.</u> p. 123. Ag Venture main-tained that investment account to earn interest or to have some other kind of financial advantage of having funds in those accounts. <u>Id.</u> p. 123-24. Mr. Bellavance agreed that Ag Venture had a higher balance in that account than it would have had if it had paid the $477,865.77 to Mr. Montagne at closing, and that it had received a financial advantage from having a higher balance in that account. <u>Id.</u> p. 124. He also acknowl-edged that Ag Venture never credited the Montages with any amount to reflect the interest Ag Venture earned on the Montagnes' funds in that account. <u>Id.</u> p. 124-25.

B. DISCUSSION

1. <u>Statutes at Issue</u>

As noted above, the Bankruptcy Code does not generally provide for the enforcement of promisso-ry notes, and the legal obligations of the parties are determined by applicable non-bankruptcy law, which is usually state law. <u>See</u> <u>Butner</u>, 440 U.S. at 54-55. In this case, the enforcement question concerns whether a note can be enforced pursuant to the Vermont Licensed Lender Act ("LLA"), 8 V.S.A. § 2200 <u>et</u> <u>seq.</u>

The pertinent licensed lender provision is 8 V.S.A. § 2233, entitled "Effect," which provides, in part:

> No person who is required to be licensed under this chapter, shall directly or indirectly charge, contract for, or receive any interest, discount, consideration or charge greater than is authorized by section 41a or 46 of Title 9. <u>No such loan</u> for which a greater rate of interest, finance charge, consideration or charges than is authorized by section 41a or 46 of Title 9 has been charged, contracted for, or received <u>shall be enforced in this state</u>, and every person in any way participating therein in this state shall be subject to the provisions of this chapter. . . .

8 V.S.A. § 2233(a) (emphasis added).[3] Section 41a of Title 9, (referred to in § 2233(a)), entitled "Legal rates," provides in pertinent part:

> (a) Except as specifically provided by law, the rate of interest or the sum allowed for forbearance or use of money shall be twelve percent per annum computed by the actuarial method.
> (b) The rate of interest or the sum allowed:
> (1) For single payment loans by lenders regulated by Title 8 and federal savings and loan associations, the finance charge shall not exceed 18 percent per annum.
> ***
>
> (d) Actuarial method
>
> (1) Unless otherwise specifically provided by law, all interest on closed-end accounts, loans or extensions of credit charged under this or any section shall be computed only on the outstanding balance subject to finance charge by the actuarial method of calculation. . . . Interest shall not be paid, deducted or added to principal in advance . . .

9 V.S.A. § 41a(a), (b), (d).

## 2. Legal Arguments

The Debtor contends that, in the case of loan # 321,

> interest was charged from the date of closing on the full stated principal amount of $882,000. However, only $305,034.10 was actually paid to or for the benefit of the borrowers at closing. The balance of the stated loan amount ($477,865.77) was credited to a so-called suspense account maintained by Ag Venture, and was not paid to or for the benefit of the borrowers until those dates [shown on Trial Ex. 13], extending over a period of 13 months after the loan closing.

(doc. # 280 pp. 10-11). The Debtor further maintains that because Ag Venture obtained the financial benefit of holding the $477,865.77 in the suspense account, in which he had no ownership or security interest, it obtained a financial benefit from that account which was not shared with him. Accordingly, "during the 13 month period after the closing of loan # 321, interest was charged on an amount far in excess of the 'outstanding balance,' in direct violation of 9 VSA 41a(d)." Id. p.11. The Debtor implicitly challenges Ag Venture's representation that the funds were fully disbursed at closing and stresses that the fact that the undisbursed portion of the loan proceeds were tracked by an internal Ag Venture account did not make it part of the outstanding balance. Id. The Debtor concludes that the "outstanding balance on Loan 321,

---

[3] 8 V.S.A. § 2233 was amended by the state legislature in 2009. Many of the LLA provisions have undergone multiple amendments over the last 25 years. None of the amendments affects this analysis.

within the meaning of 9 VSA 41a(d), was $477,865.77 less than the amount on which Ag Venture computed and collected interest, and the loan is unenforceable under 8 VSA 2233." Id. p. 12. According to the Debtor, the effect of that unenforceability is that Ag Venture was not entitled to collect any principal or interest on the loan. Id.

Ag Venture disputes that it violated the LLA. It focuses on that part of § 2233(a) that refers to the rate of interest being unenforceable (only loans "for which a greater rate of interest . . . than is authorized by section 41a or 46 of Title 9 has been charged, contracted for, or received" are unenforceable), and points out that the Debtor presented no evidence that the rate of interest charged for loan # 321 exceeded the rate that was permitted (doc. # 287 p. 11). Even if the loan funds were not considered fully disbursed on the date of closing, Ag Venture posits that its collection of interest on the face amount of the loan did not amount to usury under § 41a, and asserts that "the incorrect application of interest alone does not render the loan unenforceable." Id. Ag Venture urges the court to consider the "totality of the transaction" when determining whether this transaction was usurious and whether Ag Venture received an actual return in excess of the rate allowed under § 41a. Id. p. 12.

Ag Venture also specifically asserts that it was entitled to charge interest on the funds held in the suspense account. Its position is that the funds had been "fully disbursed" to an account where the money was held for the Debtor's benefit and over which he had complete control, and therefore the fact that the funds remained in an Ag Venture account was immaterial. Id p. 13. Ag Venture concludes that control over the proceeds determines whether funds are considered disbursed under the usury statute and since Ag Venture placed no restrictions on Mr. Montagne's ability to access the funds, they were within the Debtor's control and thus properly classified as fully disbursed. Id. p. 14.

3. Analysis

Before addressing the parties' arguments, a few comments concerning the architecture of 8 V.S.A. § 2233 and 9 V.S.A. § 41a are in order, especially in relation to the first and second sentences of § 2233(a), and how that text relates to § 41a(d)(1). The Court notes the distinction between the terms used in the first sentence of § 2233(a) and those used in the second sentence of § 2233(a). The first sentence is quite broad, and prohibits a person from charging for, contracting for, or receiving any interest, discount, consideration or charge greater than authorized in § 41a. The text of the second sentence of § 2233, oddly, does not repeat the four categories of what is prohibited in the first sentence (interest, discount, consideration, charge), even though the verbs (charging for, contracting for, and receiving) are the same. Instead, it provides that "no such loan" for which a "greater rate of interest, finance charge, consideration or charges" than authorized in § 41a has been charged, contracted for or received, shall be enforced in Vermont. While the words "consideration" and "charge(s)" are identical in the first and second sentences, the words "interest" and "discount" in sentence one are replaced with "rate of interest" and "finance charge,"

respectively, in sentence two. Sentence one refers to what actions violate the statute, while sentence two sets out the kinds of loans that shall not be enforced. It is unclear why the Legislature did not make the sentences parallel by using the same words in both sentences and nothing in the statute explains the distinction, if any, that may have been intended by using "interest" in one sentence and "rate of interest" in the other. However, the glue that joins both sentences is the reference to § 41a. It establishes the parameters of what charges (be they interest, rate of interest, discounts, finance charges, or consideration) are authorized under § 2233(a) and distinguishes permissible from impermissible lending practices in Vermont.

Section 41a(d) provides that "all interest" on closed-end[4] loans charged under § 41a or any other section (i.e., § 2233) must be "computed only on the outstanding balance of a loan subject to finance charge by the actuarial method of calculation." The key phrase in this sentence, for purposes of this case, is "outstanding balance." The question is: what sum constitutes the "outstanding balance" of this loan against which finance charges could properly be assessed? "Outstanding balance" is not defined in the statute. It is generally understood as the amount due on a particular debt at a particular time (after application of payments made and accrual of charges or interest). Ag Venture claims that it fully disbursed the entire $882,000 loan at closing and therefore this was the outstanding balance against which interest could be charged. By contrast, the Debtor insists that at the conclusion of the closing on this loan, the outstanding balance was only $305,034.10 because $477,865.77 had not been disbursed and therefore "by charging interest on $882,000 Ag Venture charged [interest] on an amount far in excess of the 'outstanding balance,' in direct violation of 9 VSA 41a(d)" (doc. # 280 p. 11).

The Court finds the Debtor's analysis persuasive and consistent with the state LLA. The undisputed evidence shows that the suspense account into which the $477,865.77 was directed at closing was owned and controlled by Ag Venture. The Debtor had the ability to withdraw funds from that account only if he made a request to Ag Venture and Ag Venture granted the request. While Ag Venture's depiction of this situation as one where the Debtor had a right to use the money may be accurate, the Debtor is correct that he did not have control over those funds as of the closing. In addition, while those funds remained under Ag Venture's control, Ag Venture reaped a benefit because the funds were swept into an investment account upon which Ag Venture earned interest. As a result, Ag Venture collected interest twice on the undisbursed $477,865.77: first, from the Debtor paying interest on the entire $882,000 loan amount (which included the $477,865.77), and second, from the interest accumulating on the investment sweep account in which the $477,865.77 had been deposited. It is undisputed that Ag Venture neither credited the Debtor's deposit account with a sum equal to the interest it received on the investment account

---

[4] The term closed end transaction describes a "completed loan, like a mortgage or a car loan," as opposed to an open-ended transaction, which includes credit card credit and revolving credit. Demarest v. Quick Loan Funding, Inc., 2009 WL 940377 at * 3 (C.D. Cal. Apr. 6, 2009).

allocable to this $477,865.77, nor reduced the amount of interest it charged the Debtor on loan # 321 by this amount. See Fact # 15, supra.

This conduct by Ag Venture clearly runs afoul of § 41a(d)(1), which allows interest to be charged only on the outstanding balance. The outstanding balance on loan # 321 as of the closing was not the $882,000 face amount of the loan, but rather the $305,034.10 sum that had actually been disbursed. Having violated § 41a(d)(1), Ag Venture has also contravened both the first and second sentences of § 2233(a). It violated the first sentence of § 2233(a) by charging interest greater than authorized by § 41a, when it charged interest on the full $882,000 – a sum greater than the outstanding balance, and violated both sentences by receiving greater "consideration" than authorized by section 41a, when it collected interest both from the Debtor and its investment account with respect to the $477,865.77 in the suspense account.

There is no evidence that would permit the Court to determine how much extra interest or consideration Ag Venture received, nor is there any evidence that would indicate that even with that additional amount, the rate of interest exceeded the statutory level. However, § 2233 requires the Court to declare a loan unenforceable if the lender received additional monies from a variety of other sources – whether interest, consideration, finance charges, discounts, or other charges – that exceed what is allowed by § 41a(d). That statute is not limited to an excess rate of interest, as Ag Venture contends, but rather encompasses excessive interest, consideration, and charges collected vis a vis the outstanding balance. The end result is that the Court is compelled to declare, pursuant to the plain meaning of the statute, that loan # 321 shall not be enforced.

While this penalty for violating the LLA is quite harsh, it appears to be exactly what the Vermont Legislature intended when it crafted this statute. "When construing a statute [the court's] primary objective is to effectuate the intent of the Legislature. [The court's] first step is to look to the language of the statute itself; we presume the Legislature intended the plain, ordinary meaning of the language. When the plain language is clear and unambiguous, our inquiry is at an end, and we enforce the statute according to its terms." Ice Center of Washington, West v. Town of Waterbury, 183 Vt. 616, 617, 950 A.2d 464, 466 (2008). Since Ag Venture violated the statute, the plain meaning of the text requires the Court to prohibit Ag Venture from enforcing the loan.

This penalty of unenforceability is not unique in the LLA. Other sections of the statute that require similarly harsh penalties be imposed upon violators. See, e.g., § 2215(c)(1) ("Any contract of loan made in knowing and willful violation of section 2201(a)(1) of this title, shall be void and the lender shall have no right to collect or receive any principal, interest, or charges whatsoever. . ."); § 2231(b) ("For loans subject to this subsection, if any interest, consideration, or charges in excess of those permitted by this subsection, except as the result of an accidental or bona fide error are charged, contracted for or received,

the contract of loan shall be void and the licensee shall have no right to collect or receive any principal, interest or charges whatsoever.").

The Vermont case law construing the LLA, although dated and focused on other sections of the statute, supports this finding of a violation, and imposition of a stiff penalty, based upon the language of the statute. The Vermont Supreme Court has decided a number of cases relating to § 2201 of the LLA with respect to the <u>licensing</u> of lenders and the penalties to be exacted when an entity – that should have been licensed but was not – lent money. In <u>Vermont Development Credit Corp. v. Kitchel</u>, 149 Vt. 421, 544 A.2d 1165 (1988), the Vermont Supreme Court held that, pursuant to the plain language of the LLA statute, plaintiff VDCC had violated the LLA by failing to be licensed, as required under § 2201. <u>Id.</u> at 424-25, 544 A.2d at 1167. The penalty for failure to comply with § 2201 at that time was found in § 2233, which then provided:

> (a) Any person. . .  . or corporation. . . who shall violate or participate in the violation of any of the provisions of this chapter shall be imprisoned not more than two years or fined not more than $500.00, or both.
> (b) Any contract of loan not invalid for any other reason, in the making or collection of which any act shall have been done which constitutes an offense under this section, shall be void and the lender shall have no right to collect or receive any principal, interest, or charges whatsoever. . .

8 V.S.A. § 2233(a), (b) (1988). While acknowledging that the voiding of a $175,000 VDCC loan was a "harsh result," the court found that it was nevertheless "specifically provided for by the Legislature in 8 V.S.A. § 2233, and thus evidently intended by it." <u>Id.</u> at 427, 544 A.2d at 1168. The court ruminated: "Our duty is to give effect to the plain meaning and intent of the legislative enactment. If the law is unfair or unjust, the remedy is to change the law itself through the legislative process." <u>Id.</u> (citing <u>Riddel v. Dep't of Employment Sec.</u>, 140 Vt. 82, 88, 436 A.2d 1086, 1089 (1981)). <u>Accord</u> <u>Burke Mountain Recreation, Inc. v. VDCC (In re Burke Mountain Recreation, Inc.)</u>, 64 B.R. 799 (Bankr. D.Vt. 1986).

Accordingly, the Court concludes that, pursuant to § 2233(a), loan # 321 may not be enforced in Vermont because the consideration Ag Venture received was greater than is authorized by 9 V.S.A. § 41a(d)(1).

## IV.    PENALTY IMPOSED FOR VIOLATION OF § 2233(a)

The Debtor's final argument is that if the Court determines that Ag Venture violated the LLA, the sums Ag Venture has collected to date on loan #321 must be restored to the estate (doc. # 280 p. 13). He asserts that Ag Venture credited $445,967.50 of the Debtor's funds to loan # 321, and those funds were "collected involuntarily by Ag Venture pursuant to irrevocable assignments of the Debtor's milk revenues." The Debtor's position is that by collecting these funds, Ag Venture was enforcing the loan in violation of § 2233, and permitting a lender to retain security or proceeds of security pledged to secure an unenforceable loan would render § 2233 "largely ineffective." Therefore, the Debtor insists that Ag Venture

must restore to the borrower any funds illegally collected in violation of the statute. <u>Id.</u> p. 14. The Debtor also claims a private right of action under the statute, insisting that disgorgement is appropriate in this case because Ag Venture has been unjustly enriched. <u>Id.</u> The Debtor has provided no case law to support his legal conclusion that an entity found to have violated § 2233 must disgorge all payments it received.

Ag Venture disputes the Debtor's characterization that the collection of funds from milk check assignments constituted "involuntary loan payments" as being unsupported by the evidence and contradicting Stipulated Fact 13 (Fact 7 above) (doc. # 287 p. 14). It points out that the Debtor has not asked for disgorgement of all payments made to Ag Venture, "only for recoupment of improper loan charges, and nothing in the statute requires disgorgement of all funds where improper interest has been charged." <u>Id.</u> pp. 14-15.

The Court finds Ag Venture's position on this point to be legally sound. First and most important, the plain text of the statute makes no provision for disgorgement. In fact, it is written in the future tense: "No such loan  . . . <u>shall be enforced</u> in this state." § 2233(a). The common sense interpretation of this phase is that the remedy comes into being when a party successfully challenges enforcement of a loan. There is no retroactivity in the tense or vocabulary of the provision and the Court will not infer any. Disgorgement is an extraordinary remedy, <u>see</u>, <u>e.g.</u> <u>Avianca, Inc. v. Corriea</u>, 1992 WL 93128 at * 12 (D.D.C. Apr. 13, 1992) (discussing disgorgement of attorney's fees and noting that "disgorgement is an extraordinary remedy"); <u>In re Quaker Distributors, Inc.</u>, 189 B.R. 63, 67 n.1 (Bankr. E.D.Pa. 1995) (noting that disgorgement of fees should generally be confined to extraordinary situations). This Court will not order disgorgement where, as here, there is nothing in the text of the statute or state law jurisprudence that supports a right to such extraordinary relief. To the extent there is any case law on point, it is consistent with Ag Venture's position. <u>See</u> <u>In re Hearn</u>, 174 B.R. at 684 ("The language of 8 V.S.A. § 2233, on its face, reflects that the penalty is not 'imposed' at the inception of the loan, but rather at the time a court determines whether or not the lender should have obtained a lender's license."). <u>See</u> <u>also</u> <u>U.S. v. Security Indus. Bank</u>, 459 U.S. 70, 79 (1982) ("[T]he first rule of construction is that legislation must be considered as addressed to the future, not to the past.. .") (citation omitted).

Consequently, the Court denies the Debtor's request for an order directing Ag Venture to disgorge the principal and interest it has collected to date on loan # 321. The Court will enter an order prohibiting Ag Venture from enforcing loan # 321; it shall be effective prospectively.

With respect to other theories the Debtor has put forward in support of disgorgement, the Court denies relief under the theory of unjust enrichment, as the Debtor presented no evidence to support this cause of action, and likewise denies relief based upon the Debtor's assertion that the milk check funds were collected "involuntarily," as this allegation has no support in the facts or evidence presented.

### CONCLUSION

For the reasons articulated above, the Court finds that Ag Venture has standing to enforce the lost June 13, 2002 commercial promissory note for loan # 321 under 9A V.S.A. § 3-309; that Ag Venture's amended proof of claim related to loan # 321 is sufficient under Rule 3001; that Ag Venture has violated 8 V.S.A. § 2233(a) of the Vermont Licensed Lender Act; and that the remedy required under the statute is an order barring Ag Venture from enforcing loan # 321. Based upon these findings, the Court grants the Debtor's motion to dismiss the complaint with respect to enforcement of note # 321 (doc. # 280), denies the Debtor's request for an order directing Ag Venture to disgorge the sums it has already collected and/or applied on this loan (id.), and overrules the chapter 12 trustee's objection to claim (doc. # 283).

With respect to the objections raised to the admission of certain evidence introduced at the mini-trial, the Court declares them to be moot, in light of the findings, conclusions and determinations set forth in this memorandum of decision.

This constitutes the Court's findings of fact and conclusions of law.

Rutland, Vermont
November 13, 2009

Colleen A. Brown
United States Bankruptcy Judge

26